## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## WESTERN DIVISION

| | | |
|---|---|---|
| **Christian Employers Alliance**, on behalf of itself and its members, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | **Civil Action No. _____** |
| **United States Equal Employment Opportunity Commission**; and **Charlotte A. Burrows**, in her official capacity as Chair of the United States Equal Employment Opportunity Commission, | § § § § § § § | |
| *Defendants*. | § § § | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

1.     Plaintiff Christian Employers Alliance (CEA), on behalf of its members, challenges two federal employment mandates that exceed the government's statutory and constitutional authority.

2.     *First*, the Equal Employment Opportunity Commission (EEOC) has improperly applied Title VII of the Civil Rights Act of 1964 to force employers to affirm and accommodate employees' gender-transition efforts (EEOC's Gender-Identity Mandate). This mandate, published in agency "guidance" and on its website, threatens employers with large penalties if they do not use employees' self-selected pronouns based on gender identity, and if they do not allow males to access female single-sex restrooms, locker rooms, and lactation rooms.

3.     *Second*, EEOC issued a final rule that twists the Pregnant Workers Fairness Act (PWFA), Consolidated Appropriations Act of 2023, Public Law 117-328, Div. II, 136 Stat. 4459, 6084–89 (2022) (codified at 42 U.S.C. 2000gg to 2000gg-

6), a statute intended to protect pregnant mothers in the workplace, to impose a nationwide abortion mandate forcing employers to promote and facilitate elective abortion. Implementation of the Pregnant Workers Fairness Act, 89 Fed. Reg. 29,096 (Apr. 19, 2024) (the "PWFA Abortion Mandate" or "PWFA Rule"). This rule prevents employers from speaking their pro-life beliefs, requires employers to knowingly give employees special leave, including paid leave, to obtain abortions, and precludes employers from enforcing life-affirming workplace policies against employees who engage in conduct contrary to those policies.

4.    EEOC's actions are collectively called the "EEOC Mandates."

5.    CEA seeks injunctive and declaratory relief against the EEOC Mandates. Many employers—including CEA members—recognize that gender-transition efforts and elective abortions harm employees and others. Affirming or facilitating transition efforts or elective abortions ignores the biological realities that humans are male or female and that human life begins at conception.

## JURISDICTION AND VENUE

6.    This action arises under the Constitution and laws of the United States and therefore this Court has jurisdiction under 28 U.S.C. §§ 1331 and 1361.

7.    This Court has authority to award the requested declaratory and injunctive relief under 5 U.S.C. § 706, 28 U.S.C. § 1361, 28 U.S.C. §§ 2201 and 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 2000bb-1.

8.    This Court may review Defendants' unlawful actions and enter appropriate relief as provided by the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb-1(c), and the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 701–706.

9.    This Court may review and enjoin ultra vires or unconstitutional agency action through an equitable cause of action. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689–71 (1949).

10.    This Court can award costs and attorney's fees under 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b).

11.    Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(e)(1) because Christian Employers Alliance is incorporated in the State of North Dakota and its registered agent is in Bismarck, North Dakota, which is located in this district. No real property is involved in this action, and a substantial part of the events or omissions giving rise to the claim occurred in this district and division since the actions challenged in this case regulate the members of Christian Employers Alliance.

## PARTIES

### *Plaintiff*

12.    Plaintiff Christian Employers Alliance is a nonprofit entity incorporated in North Dakota and its registered agent is in Bismarck, North Dakota. CEA is a membership organization whose mission is to advocate for the rights of its members on issues of religious liberty, the sanctity of life, and the biological and Biblical reality of humans being male and female. CEA files this case and seeks relief on behalf of its current and future members.

13.    CEA identifies two members below that need relief from the EEOC Mandates challenged here, including Predictive Fitness, Inc., and Moms for America.

***Defendants***

14.    Defendant Equal Employment Opportunity Commission is a federal agency that administers, interprets, and enforces certain laws, including Title VII and the PWFA. EEOC's address is 131 M Street NW, Washington, DC 20507.

15.    Defendant Charlotte A. Burrows is the EEOC Chair. She is responsible for the administration and implementation of policy within EEOC, including investigation and enforcement under Title VII. She is sued only in her official capacity. References to EEOC include Burrows unless context dictates otherwise. Her address is 131 M Street NW, Washington, DC 20507.

## ALLEGATIONS OF LAW AND FACT

### I.    Title VII of the Civil Rights Act of 1964

#### A.    Title VII's Prohibition on Sex Discrimination

16.    Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual ... because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1).

17.    Title VII also makes it unlawful to discriminate against an employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." *Id.*

18.    Title VII requires employers to accommodate their employees' religious beliefs. 42 U.S.C. 2000e(j).

19.    Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 2000e(b).

20.    Congress enacted the Pregnancy Discrimination Act in 1978 to further define what constitutes "sex" discrimination under Title VII. It specified that the

terms "because of sex" or "on the basis of sex" include "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

21.     When Congress passed Title VII and its amendments, Congress understood the term "sex" to mean one of two binary biological sexes: male or female.

22.     Title VII allows for employee positions where sex is a bona fide employment qualification. 42 U.S.C. § 2000e-2(e).

23.     Title VII does not by its text require employers to make exemptions from workplace policies to accommodate an employee's gender identity.

24.     Under Supreme Court precedent, Title VII prohibits certain workplace harassment and abusive working environments.

**B.    Enforcement Mechanisms under Title VII and the PWFA**

25.     Under Title VII, EEOC has the "authority from time to time to issue, amend, or rescind suitable procedural regulations to carry out the provisions of this subchapter." 42 U.S.C. § 2000e-12(a).

26.     EEOC is not authorized to promulgate substantive rules implementing Title VII.

27.     EEOC has investigatory authority for alleged Title VII violations, may serve notices of charges of discrimination, and "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b).

28.     EEOC may bring a civil action against an employer. 42 U.S.C. § 2000e-5(f).

29.     Title VII also includes a private right of action for employees. *Id.*

30.     Employers may face private lawsuits brought by parties claiming a violation of Title VII.

31.    An employer found to violate Title VII can be enjoined from engaging in the unlawful practice, and can be ordered to take "affirmative action as may be appropriate ... or any other equitable relief" that a court finds "appropriate." 42 U.S.C. § 2000e-5(g)(1).

32.    Courts may mandate that employers adopt certain policies.

33.    Employers can be liable for compensatory damages, as well as punitive damages. 42 U.S.C. § 2000e-5(e)(3)(B); *see also* 42 U.S.C. § 1981a.

34.    Employers found liable under Title VII may be required to pay costs and the attorney's fees of the prevailing party. *Id.* § 2000e-5(k), § 1988(b).

35.    The powers, remedies, and procedures provided for Title VII violations are the same as those for PWFA violations.  42 U.S.C. § 2000gg-2.

36.    CEA members face the threat of all these enforcement mechanisms for violating EEOC's Mandates.

## II.    EEOC's Unlawful Gender-Identity Mandate

37.    EEOC has unlawfully sought to go beyond its Title VII authority to impose a far-reaching gender-identity mandate on employers.

38.    EEOC interprets discrimination on the basis of sex in Title VII as encompassing discrimination on the basis of gender identity in all aspects of employment.

39.    EEOC's mandate on gender identity in the workplace collectively resides in requirements published on its website, specific guidance published in 2024, and a history of enforcement actions. Together these are referred to herein as EEOC's Gender-Identity Mandate.

40.    EEOC has applied its Title VII interpretation to require employers to affirm and facilitate employees' gender transitions based on their purported gender identity, including requiring access to single-sex intimate spaces like restrooms,

locker rooms, and lactation rooms, and requiring that employers use employees'
self-selected pronouns.

41.    EEOC forces employers to not require male employees to comply with
work rules for males based on gender identity and to not require female employees
to comply with work rules for females, based on gender identity.

42.    EEOC prohibits employers from refusing to affirm or facilitate
transition efforts, including by requiring employers to provide access to single-sex
facilities based on gender identity and forcing them to use pronouns based on
gender identity.

43.    Under *Bostock v. Clayton County*, 590 U.S. 644 (2020), Title VII
prohibits hiring or firing an employee because he or she identifies as the opposite
sex. But *Bostock* expressly disavows its application to other workplace situations
such as an employer's private spaces like bathrooms. Nor does the case address
pronoun usage, harassment, dress code, or other speech in the workplace.

### A.    EEOC's Unlawful Website Actions on Gender Identity

44.    EEOC's website says that "[d]iscrimination against an individual
because of gender identity, including transgender status, or because of sexual
orientation is discrimination because of sex in violation of Title VII."[1]

45.    EEOC's website says that "it is illegal to discriminate … because of
that person's race, color, religion, sex (including gender identity, sexual orientation,
and pregnancy)."[2]

46.    EEOC's website says that "[t]he law makes it illegal for an employer to
make any employment decision because of a person's … sex (including gender
identity, sexual orientation, and pregnancy)." *Id.*

---

[1] EEOC, Sex-Based Discrimination, https://perma.cc/EE2T-XRLA.

[2] EEOC, Prohibited Employment Policies/Practices, https://perma.cc/74GK-E4DS.

47.    EEOC's website says that "[t]he laws enforced by EEOC prohibit …
neutral employment policies and practices that have a disproportionately negative
effect on applicants or employees of a particular … sex (including gender identity,
sexual orientation, and pregnancy), … if the polices or practices at issue are not job-
related and necessary to the operation of the business." *Id.*

48.    EEOC's website says that "[i]t is illegal to harass an employee because
of … sex (including gender identity, sexual orientation, and pregnancy)." *Id.*

49.    EEOC's website says that "[t]he law forbids sexual orientation and
gender identity discrimination when it comes to *any* aspect of employment,
including hiring, firing, pay, job assignments, promotions, layoff, training, fringe
benefits, and any other term or condition of employment."[3]

50.    EEOC's website says that "employers may not deny an employee equal
access to a bathroom, locker room, or shower that corresponds to the employee's
gender identity. In other words, if an employer has separate bathrooms, locker
rooms, or showers for men and women, all men (including transgender men) should
be allowed to use the men's facilities and all women (including transgender women)
should be allowed to use the women's facilities." *Id.*

51.    EEOC's website says that "[i]t is unlawful to subject an employee to
workplace harassment that creates a hostile work environment based on sexual
orientation or gender identity." *Id.* "Harassment can … include, for example,
offensive or derogatory remarks about a person's transgender status or gender
transition." *Id.* So "intentionally and repeatedly using the wrong name and
pronouns to refer to a transgender employee could contribute to an unlawful hostile
work environment." *Id.* "Prohibiting a transgender person from dressing or

---

[3] EEOC, Sexual Orientation and Gender Identity (SOGI) Discrimination (emphasis
added), https://perma.cc/3WMS-R7D4.

presenting consistent with that person's gender identity would constitute sex discrimination." *Id.*

52.    EEOC's website says that "[s]ex discrimination involves treating someone (an applicant or employee) unfavorably because of that person's sex, including the person's sexual orientation, gender identity, or pregnancy."[4]

53.    Defendant Burrows issued a "technical assistance document" (the 2021 Guidance),[5] discussing the application of *Bostock* in all covered workplaces, and it required employers to treat employees according to gender identity when accessing intimate spaces, using pronouns, and applying dress codes.

54.    A federal court vacated the 2021 Guidance, holding that the 2021 Guidance lacked statutory authority, exceeded EEOC rulemaking power, and skipped the APA's required notice-and-comment procedures. *Texas v. EEOC*, 633 F. Supp. 3d 824, 840–42, 847 (N.D. Tex. 2022). Another court concluded that the 2021 Guidance was invalid because the EEOC skipped notice-and-comment procedures. *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 839–40, 842 (E.D. Tenn. 2022).

### B.    EEOC's Unlawful Harassment Guidance on Gender Identity

55.    In October 2023, EEOC proposed the 2024 Guidance through an announcement in the *Federal Register*, but EEOC did not publish the proposed guidance itself in the *Federal Register* when it requested comments.[6]

---

[4] EEOC, Sex-Based Discrimination, *supra* note 1.

[5] EEOC, Protections Against Employment Discrimination Based on Sexual Orientation or Gender Identity, https://perma.cc/V4ZX-636V.

[6] Proposed Enforcement Guidance on Harassment in the Workplace, 88 Fed. Reg. 67,750 (Oct. 2, 2023); *see* https://perma.cc/KYA9-Z5RX.

56.    On April 26, 2024, EEOC by a 3-2 vote issued "enforcement guidance," effective on April 29, 2024 (the 2024 Guidance).[7]

57.    EEOC published the final 2024 Guidance on the internet, but EEOC did not publish the proposed or final 2024 Guidance in the *Federal Register*.

58.    The 2024 Guidance reads Title VII to require employers to treat employees according to their gender identities or else face liability.

59.    The 2024 Guidance imposes the same requirements as the 2021 Guidance that the federal court vacated as unlawful—applying to single-sex facilities, pronoun usage, and dress codes.[8]

60.    Under the 2024 Guidance, employers must allow any male employee who identifies as female to use the female bathrooms, locker rooms, and showers, and vice versa.

61.    Under the 2024 Guidance, employers must require employees to refer to any male employee who identifies as female using female pronouns, and vice versa.

62.    Under the 2024 Guidance, employers must allow any male employee who identifies as female to wear clothes complying with the dress code for females, and vice versa.

63.    Under the 2024 Guidance, EEOC staff will investigate employers who do not make decisions about facilities, pronoun usage, and dress-code for employees based on gender identity.

---

[7] EEOC, Enforcement Guidance on Harassment in the Workplace (Apr. 29, 2024) [hereinafter 2024 Guidance], https://perma.cc/7V7L-PN7P; EEOC, Commission Votes: April 2024, https://perma.cc/G5V2-SJ2G.

[8] 2024 Guidance, *supra* note 7, at II.A.5.b & c.

64.    The 2024 Guidance identifies itself as "the Commission's guidance on harassment in the workplace under EEOC-enforced laws. It communicates the Commission's position on important legal issues." *Id.* at Purpose.

65.    The 2024 Guidance "addresses how harassment based on … sex … is defined under EEOC-enforced statutes and the analysis for determining whether employer liability is established." *Id.* at Summary.

66.    The 2024 Guidance contains "Commission-approved enforcement guidance [which] presents a legal analysis of standards for harassment and employer liability applicable to claims of harassment under the equal employment opportunity (EEO) statutes enforced by the Commission, which prohibit work-related harassment based on … sex (including ... sexual orientation[ ] and gender identity).… This guidance serves as a resource for employers, employees, and practitioners; for EEOC staff and the staff of other agencies that investigate, adjudicate, or litigate harassment claims or conduct outreach on the topic of workplace harassment; and for courts deciding harassment issues." *Id.* at I.A.

67.    The 2024 Guidance says, "Sex-based discrimination under Title VII includes discrimination based on ... gender identity [citing *Bostock*]. Accordingly, sex-based harassment includes harassment based on ... gender identity, including how that identity is expressed." *Id.* at II.A.5.c.

68.    The 2024 Guidance describes prohibited "harassing conduct." *Id.* One example of harassing conduct and discriminatory action is an employer's "denial of access to a bathroom or other sex-segregated facility consistent with the individual's gender identity." *Id.* Another is "repeated and intentional use of a name or pronoun inconsistent with the individual's known gender identity (misgendering)." *Id.* The 2024 Guidance also makes it unlawful to act against an employee for not "present[ing] in a manner that would stereotypically be associated with that person's sex." *Id.*

69.    The 2024 Guidance provides examples of prohibited harassment based on gender identity. Those examples include employers using biologically accurate pronouns and employers applying sex-specific attire requirements. *Id.*

70.    The 2024 Guidance says that an employee can establish a claim for hostile work environment because of the employee's "protected characteristic" through stereotyping or some combination of context, timing, and comparative evidence. *See id.* at II.B.1–5.

71.    In support of its 2024 Guidance, EEOC cited past administrative appeals decisions and district court cases to say that calling an employee by something other than his or her preferred pronoun or denying individuals access to sex-segregated spaces that correspond with their gender identity constitutes harassment. *Id.* at II.A.5.c & n.42.

### C.    EEOC's unlawful enforcement actions on gender identity

72.    EEOC has brought enforcement actions seeking to force employers to affirm transition efforts or to treat an employee as the opposite sex based on gender identity, including in access to intimate spaces and pronoun usage.[9]

---

[9] *See, e.g., EEOC Sues Boxwood and Related Hotel Franchises for Discriminating Against Transgender Employee* (Sept. 26, 2024), https://perma.cc/P2QF-TNSF ("Misgendering and Anti-Transgender Comments"); *EEOC Sues Reggio's Pizza for Retaliation* (Sept. 25, 2024), https://perma.cc/8PKT-PW53 ("misgendering"); *EEOC Sues Two Employers for Sex Discrimination* (June 13, 2024), https://perma.cc/4PS8-A8UR (seeking to impose liability for employment actions taken "after management observed him styled and dressed in a manner they perceived to be feminine and that differed from management's preferred appearance for male employees"); *Columbia River Healthcare to Settle EEOC Harassment Charge* (May 23, 2024), https://perma.cc/Z3SY-6JSK (seeking to impose liability for treatment of a supervisor after "managers and staff persisted in repeatedly and intentionally referring to them using pronouns inconsistent with their gender identity"); *EEOC Sues Sis-Bro, Inc. for Gender Identity Discrimination and Harassment* (Mar. 28, 2024), https://perma.cc/H4TB-E6HC (seeking to impose liability for making "frequent, derogatory comments about the targeted employee's gender identity;"

73.    In October 2024, EEOC sued a restaurant chain for "misgendering, deadnaming (using a name a person no longer uses against their wishes) and publicizing [an employee's] birth name without consent."[10]

74.    The same month EEOC sued another restaurant for "subjecting the transgender employees to misgendering" and "unequal access to bathrooms."[11] An EEOC official commented, "Just as employers should not tolerate the use of racial slurs in the workplace, they must also prohibit misgendering and 'deadnaming' their transgender employees." *Id.*

75.    EEOC reports that in fiscal year 2023, "EEOC received more than 3,000 charges alleging discrimination based on sexual orientation or gender identity, the most since the agency started tracking these charges in FY 2013, and up more than 36% from the previous year." *Id.*

### D.    The EEOC Gender-Identity Mandate's Compliance Costs

76.    Under Title VII, employers are required to have adequate training materials and procedures for reporting unlawful harassment.

77.    Under the 2024 Guidance, an employer must take affirmative steps to prevent and correct violations of EEOC's Gender-Identity Mandates. According to

---

refusing "to call the targeted employee by her name and refer[ing] to her by her former name;" telling "her she was 'a guy;'" and "criticiz[ing] her use of employer-provided health insurance and leave for gender affirming care"); *Deluxe Financial to Settle Sex Discrimination Suit on Behalf of Transgender Employee* (Jan. 21, 2016), https://perma.cc/KM8W-M49S (restroom access and pronoun usage).

[10] *EEOC Sues Culver's for Discriminating Against Transgender Employee and Retaliating Against Him and His Co-Workers* (Oct. 25, 2024), https://perma.cc/425R-LBWR (describing *EEOC v. Brik Enters., Inc.*, Case No. 24-cv-12817 (E.D. Mo. filed Oct. 25, 2024)).

[11] *EEOC Sues Two Employers for Sex Discrimination*, https://perma.cc/YAN2-H9SR (describing *EEOC v. Starboard Group, Inc.*, Case 3:24-cv-02260 (S.D. Ill. filed Oct. 1, 2024)).

EEOC, this can "usually" be accomplished by "promulgating a policy against harassment, establishing a process for addressing harassment complaints, providing training to ensure employees understand their rights and responsibilities, and monitoring the workplace to ensure adherence to the employer's policy."[12]

78.     Employers, including CEA members, need to devote significant time and resources to creating or updating policies, establishing processes, creating and providing training, and monitoring the workplace.

79.     To comply with EEOC's mandates, each CEA member (including its identified members discussed in more detail below, Predictive Fitness, Inc., and Moms for America) would need to devote significant time and resources to creating or updating policies, processes, training, and monitoring programs. At a minimum, this would require several hours of employee time, imposing costs well above $1,000 of lost employee value per company.

## III.    EEOC's Unlawful PWFA Abortion Mandate

### A.    The PWFA's Legislative Background

80.     The PWFA was enacted to provide more robust protections to expectant mothers in their employment.

81.     The PWFA was drafted because neither Title VII nor other federal laws require employers to affirmatively accommodate women's pregnancies, childbirth, or pregnancy-related medical conditions unless the employer provides the accommodation to comparator workers who are limited in their ability to work for reasons unrelated to pregnancy. The PWFA requires employers to accommodate pregnant employees who have physical limitations due to pregnancy or childbirth. Under the PWFA, employers are required to accommodate a pregnant employee's

---

[12] 2024 Guidance, *supra* note 7, at IV.C.2.b.i.

"known limitation," which means a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. §§ 2000gg(4), 2000gg-1(1).

82.    A reasonable accommodation might include: the option to change worksites or to take bathroom, food, or hydration breaks; enhanced accessibility to the workplace; lifting devices; preferred parking; job restructuring (for example, part-time status, reassignment to vacant position); remote work and telework; accessing paid leave; and extra unpaid time-off for medical appointments or childbirth. Regulations to Implement the Pregnant Workers Fairness Act, 88 Fed. Reg. 54,714, 54,768 (proposed Aug. 11, 2023) (listing accommodations).

83.    Employers must not refuse to make a reasonable accommodation for a qualified employee. 42 U.S.C. § 2000gg-1(1); 89 Fed. Reg. at 29,186.

84.    Employers may not take an adverse action against an employee because she requested an accommodation. 42 U.S.C. § 2000gg-1(5); 89 Fed. Reg. at 29,187.

85.    Employers may not "coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of such individual having exercised or enjoyed, or on account of such individual having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." *Id*. § 2000gg-2(f)(2).

86.    Nor may employers retaliate against an employee for opposing unlawful discrimination under the PWFA, 42 U.S.C. § 2000gg-2(f)(1) & (f)(2); 89 Fed. Reg. at 29,188.

87.    The PWFA applies to employers with 15 or more employees. 42 U.S.C. § 2000gg(2)(B).

88.    The text of the PWFA does not mention abortion, and it does not require employers to accommodate employees seeking an abortion.

15

89.    Senator Bob Casey, who sponsored the bill, said, "[U]nder the Pregnant Workers Fairness Act, the [EEOC] could not—could not— issue any regulation that requires abortion leave, nor does the act permit the EEOC to require employers to provide abortions in violation of State law." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

90.    Senator Steve Daines agreed: "I want to make clear for the record that the terms 'pregnancy' and 'related medical conditions,' for which accommodations to their known limitations are required under the legislation, do not include abortion. ... Senator Casey's statement reflects the intent of Congress in advancing the [PWFA] today. This legislation should not be misconstrued by EEOC or Federal courts to impose abortion-related mandates on employers, or otherwise to promote abortions, contrary to the intent of Congress." 168 Cong. Rec. S10081 (daily ed. Dec. 22, 2022).

91.    Co-sponsor Senator Bill Cassidy likewise "reject[ed] the characterization that [the PWFA] would do anything to promote abortion." 168 Cong. Rec. S7050 (daily ed. Dec. 8, 2022).

## B.    The House of Representatives' Lack of a Quorum for the PWFA

92.    On December 23, 2022, the House of Representatives passed the PWFA by allowing members to vote by proxy. 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).

93.    On December 23, 2022, only 205 of the Members of the House of Representatives were present in the House's chamber. 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

94.    The final tally for passage of the PFWA, according to the Clerk of the House, was 225 yeas, 201 nays, 1 "present," and 4 not voting. 167 Cong. Rec. at H10528–29 (daily ed. Dec. 23, 2022).

95.    226 of those votes were cast in absentia, by Representatives appointed as proxies for absent Representatives. 168 Cong. Rec. H10529 (daily ed. Dec. 23, 2022).

96.    Fewer than half of the members counted as voting on the PWFA were actually present.

97.    The House purported to accept the Senate's amendments to the Consolidated Appropriations Act of 2023, Pub. L. 117-328, Division II, 136 Stat. 4459, 6084 (2022) (codified at 42 U.S.C. ch. 21G), which included the PWFA. 168 Cong. Rec. H10528–29 (daily ed. Dec. 23, 2022).

98.    The House purported to act under a House Rule that allowed absent members to vote by proxy. H.R. Res. 8, § 3(s), 117th Cong. (Jan. 4, 2021) (adopting H.R. Res. 965, 116th Cong. (May 15, 2020)). That resolution allowed Members to "designate[ ] another Member as a proxy" to "cast the vote" of the designating Member if "a public health emergency due to a novel coronavirus is in effect[.]" H.R. Res. 965 § 1(a).

99.    The House had never before authorized votes by proxy on legislation before the full House.

100.    The week after the House members voted this package, President Biden signed it. It was enrolled as Public Law 117-328 on December 29, 2022.

101.    The Constitution defines absent members as excluded from "a Quorum to do Business," see U.S. Const. art. I, § 5, cl. 1, and therefore unauthorized to vote to enact legislation—by proxy or otherwise.

102.    The Constitution permits a minority of the House only to "adjourn from day to day" and "compel the [a]ttendance of absent Members...." U.S. Const. art. I, § 5, cl. 1.

103.    A federal court held that the PWFA is unconstitutional under the Quorum Clause. *Texas v. Garland*, 719 F. Supp. 3d 521 (N.D. Tex. 2024) (enjoining

administrative or other adjudication of PWFA claims against State of Texas because Congress, having passed the bill through proxy voting, violated the Quorum Clause in U.S. Const., art. I, § 5).

104.    EEOC considers Congress to have duly enacted the PWFA. Consolidated Appropriations Act of 2023, Div. II, Pub. L. No. 117-328, 136 Stat. 4486, 6084–89 (2022).

### C.    EEOC's Unlawful PWFA Abortion Mandate Rule

105.    The PWFA directed the EEOC to adopt a rule to implement the PWFA and provide examples of reasonable accommodations. 42 U.S.C. § 2000gg-3(a).

106.    The elective and intentional termination of a pregnancy is not a "known limitation" or a "condition" relating to pregnancy. Abortion is not a limitation or a condition, but a procedure.

107.    EEOC's PWFA Abortion Mandate stated that "pregnancy, childbirth, or related medical conditions" includes "termination of pregnancy ... via … abortion." 89 Fed. Reg. at 29,183 (to be codified as 29 C.F.R. § 1636.3(b)).

108.    EEOC said that "pregnancy, childbirth, or related medical conditions" includes abortion because EEOC "interpreted 'pregnancy, childbirth, or related medical conditions' in Title VII to include the decision to have—or not to have—an abortion." *Id.* at 29,106.

109.    The PWFA Rule includes abortions, regardless of whether the procedure is medically related—and even if the abortion is illegal under state law.

110.    Congress directed that certain terms in the PWFA incorporated from the ADA "shall be construed as such terms are construed" under the ADA, 42 U.S.C. § 2000gg(7), but the PWFA does not incorporate any prior usage of the "pregnancy, childbirth, or related medical conditions" language of 42 U.S.C. § 2000e(k).

111.    To support transforming a pregnancy protection into an abortion mandate, EEOC said that EEOC and some courts under *Roe v. Wade*, 410 U.S. 113 (1973), interpreted Title VII to prohibit employment actions against employees who "contemplated having, or chose to have, an abortion." 89 Fed. Reg. at 29,110, 29,152 n.296.

112.    EEOC considers its interpretation "settled," and so, even though EEOC cited no evidence that Congress was aware of this interpretation as applied to the PWFA, EEOC assumed that Congress must have intended to carry it forward in the PWFA despite bill sponsor statements to the contrary. *Id.* at 29,106, 29,109, 29,191 n.23.

113.    EEOC Chair Burrows and two other commissioners voted for the PWFA Abortion Mandate.

114.    One commissioner published a statement expressing her dissent from the 3-2 vote.

115.    Under the PWFA statute, employers must accommodate pregnant working women by enabling them to keep their jobs and their babies, but under the PWFA Abortion Mandate, employers must accommodate seeking an elective abortion. This distortion seeks to avoid, rather than to accommodate, pregnant women and unborn children.

116.    Many members of the public, including CEA,[13] filed public comments opposing the PWFA Abortion Mandate.

117.    CEA explained in its comment that its members "believe human life should be honored and protected at all stages of life, and abortion is contrary to Christian values. Therefore, our employers support providing accommodations for

---

[13] CEA, Comment Letter on Proposed PWFA Rule, 2 (Oct. 10, 2023), https://downloads.regulations.gov/EEOC-2023-0004-97876/attachment_1.pdf.

pregnant women and oppose any attempt to force businesses or organizations to facilitate abortion." *Id*. at 1.

### D.    The PWFA's Rule's Restrictions on Pro-Life Employers

118.    Because EEOC added abortion to the PWFA Rule, the rule applies the PWFA prohibition against retaliation, coercion, intimidation, threats, harassment, and interference to abortion-related speech.

119.    The PWFA Abortion Mandate requires employees to silence speech that would seek to persuade or discourage an employee from seeking an abortion accommodation or else risk liability for harassment.

120.    The PWFA Abortion Mandate interprets the PWFA prohibition on harassment as applying to employee handbooks or policies that fail to facilitate efforts to seek an elective abortion.

121.    Under the PWFA Abortion Mandate, every employer must adopt policies and procedures that affirm and facilitate abortion and that restrict employers and employees in expressing their pro-life views because EEOC views such discussions as creating a hostile environment for employees who choose abortion.

122.    Even if an employer grants accommodations for abortions beyond accommodations afforded for other medical procedures, an employer could violate the PWFA Abortion Mandate simply by taking a public or intra-office pro-life stance—such as favoring adoption over abortion—if the stance could make women feel unwelcome for seeking an abortion accommodation.

123.    The PWFA Abortion Mandate requires an employer to engage in an interactive process with its employee when the employer learns that the employee is considering or seeking abortion, so the employer might determine the appropriate accommodation.

124.    One predictable consequence of imposing this process is that a pro-life religious employer, such as one of CEA's members, is more likely to find out about an employee's elective abortion, whereas, before, the employee might simply have taken off work for an abortion using ordinary medical leave without specifying the precise reason why.

125.    Consequently, the PWFA Abortion Mandate forces pro-life religious employers to knowingly affirm and facilitate an abortion by leave and other accommodations beyond what would be given for other medical procedures.

126.    The PWFA Abortion Mandate does not require paid leave for abortions as such, but if paid leave is provided for medical procedures, the rule would deem employers as discriminating and failing to accommodate if they do not provide paid leave for an abortion to an even greater extent.

127.    The PWFA Abortion Mandate prohibits employers from taking any adverse action against an employee who has an abortion, requests an abortion accommodation, encourages other women to seek an abortion, or advocates against the employers' religious policies regarding abortion.

128.    The PWFA Abortion Mandate forces pro-life non-profit organizations to hire or keep on staff employees who have abortions even if they do so in violation of the organization's mission and public advocacy.

129.    EEOC would view taking an adverse action against an employee contemplating or reporting an elective abortion as violating the anti-retaliation provision in the PWFA Abortion Mandate.

130.    The PWFA Abortion Mandate also allows employees to bypass the normal processes to be eligible to take paid or unpaid leave, like needing prior approval or giving advance notice.

E.    **The PWFA Abortion Mandate's Compliance Costs**

131.    The PWFA Abortion Mandate anticipates compliance costs for all employers.

132.    The PWFA Abortion Mandate predicts that covered employers will incur total one-time administrative costs of over $450 million, broken down to between 0.75 and 2.25 hours per employer, comprised of "rule familiarization, posting new EEO posters, and updating EEO policies and handbooks." 89 Fed. Reg. at 29,177.

133.    EEOC estimates this will result in average costs of $113.51 per hour in lost employee time per private employer. 89 Fed. Reg. at 29,176 tbl.9.

134.    EEOC likely underestimates the time needed for employers to read, understand, and create policies to implement the 125-page triple-column single-spaced PWFA Abortion Mandate, as well as the hourly cost to businesses of staff spending time to engage in these efforts, and of the opportunity cost of lost income the business could be earning by the staff spending their time on compliance. So the compliance costs for employers are likely much higher than EEOC's $113.51 per hour estimate.

135.    The PWFA Abortion Mandate predicts that the annual cost of all PWFA accommodations to private employers will be $28.02 million. *Id*. at 29,177 tbl.6.

IV.    **EEOC's Failure to Respect Religious-Liberty and Free-Speech Protections**

136.    Both EEOC Mandates failed to provide employers upfront religious exemptions, leaving religious employers to guess at whether EEOC will refrain from enforcing these mandates against employers who have religious objections.

137.    EEOC fails to explain how religious exemptions apply in its gender-identity requirements.

138.    The 2024 Guidance says that "in some cases, the application of the EEO statutes enforced by the EEOC may implicate other rights or requirements including those under the United States Constitution; other federal laws, such as the Religious Freedom Restoration Act (RFRA); or sections 702(a) and 703(e)(2) of Title VII," and that EEOC will "consider the implication of such rights and requirements on a case-by-case basis."[14]

139.    The 2024 Guidance fails to provide covered entities with information about whether or when religious exemptions apply.

140.    The 2024 Guidance takes a similarly non-specific approach towards free speech. *Id*. at Addendum ("The interplay between free speech protections and statutory harassment prohibitions in particular matters can be highly fact-specific, and the Commission will carefully consider these issues as presented on a case-by-case basis. A detailed discussion of free speech principles, however, is beyond the scope of this final guidance.").

141.    Title VII's statutory text says that it "shall not apply" to a religious organization's "employment of individuals of a particular religion." 42 U.S.C. § 2000e-1(a). "Religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

142.    The PWFA statute incorporates Title VII's religious exemption. *Id*. § 2000gg-5(b).

143.    In the PWFA Abortion Mandate, however, EEOC limited the statutory religious exemption to protecting an employer's belief, *not* an employee's or job applicant's adherence to the employer's religious beliefs and practices. 88 Fed. Reg. at 54,747; 89 Fed. Reg. at 29,144–46.

---

[14] 2024 Guidance at I.A.

144.    The PWFA Abortion Mandate also limits any religious defense to charges of religious discrimination (which are assessed on a case-by-case basis), *not* as a defense to any of the PWFA Rule's mandates, which EEOC has framed as abortion discrimination, not religious discrimination. See, e.g., 89 Fed. Reg. at 29,146–47.

145.    The PWFA Abortion Mandate also says that the Title VII religious exemption applies only to "hiring or firing claims, rather than terms or conditions of employment." 89 Fed. Reg. at 29,147 n. 239.

146.    This cramped view nullifies Congress' incorporation of Title VII's religious exemption in the PWFA.

147.    In the PWFA Abortion Mandate, EEOC discusses the limits, but not the protections, of RFRA and the First Amendment. 88 Fed Reg. at 54,746–47, 89 Fed. Reg. at 29,096 n.8, 29,148–53.

148.    In the PWFA Abortion Mandate, EEOC says its nondiscrimination goals serve a compelling government interest that could overcome religious-liberty protections, such as under RFRA. 89 Fed. Reg. at 29,148.

149.    Despite providing dozens of examples throughout the PWFA rule preamble about how the rule will apply to pregnancy discrimination, EEOC refused "to provide legally binding responses to employer inquiries about the potential applicability of religious … defenses." 89 Fed. Reg. at 29,147.

## V.    Christian Employers Alliance

150.    CEA advocates for the freedom of Christian employers seeking to conduct their ministries and businesses according to their religious values.

151.    It is part of CEA's mission to represent its members. One of CEA's primary purposes is to support Christian employers and develop strategies for them, so that they, as part of their religious witness and exercise, may provide

health or other employment-related benefits to their respective employees and engage in other employment practices in a manner consistent with their Christian beliefs.

152.    CEA members recognize the biological reality that humans are male or female, and they recognize the biological reality that abortion ends an unborn life. They hold these views as a matter of Christian beliefs set forth in CEA's bylaws, which members must accept to become members.

153.    CEA members are similarly situated to each other, all having the same Christian faith and convictions that oppose affirming or facilitating gender transitions or abortions. They hold the same religious objections to the EEOC Mandates. The EEOC Mandates impose the same burdens on CEA's members and puts them to the same unlawful choices.

154.    Most CEA members are engaged in an industry affecting commerce and employ fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. Thus, most CEA members are employers subject to the requirements of Title VII and the PWFA.

155.    Membership in the Christian Employers Alliance is open to Christian employers who operate their businesses according to biblical principles, who share their faith in the workplace, and who agree to CEA's specific principles and values.

156.    CEA's articles of incorporation state that its purposes are exclusively religious, charitable, and educational.

157.    CEA is organized to define and state specific Christian ethical convictions as they relate to religious exercise in the workplace.

158.    CEA is organized to work and advocate for the religious freedom of Christian and other religious employers seeking to conduct their ministries and businesses according to their religious values.

159.    CEA is organized to support Christian employers in responding to changes in civil law that threaten their ability to conduct their affairs consistent with CEA's Christian Values.

160.    CEA is organized to make charitable donations to Christian ministries qualifying as religious or charitable organizations.

161.    CEA's directors are required to be Christians known by their respective pastors.

162.    CEA's officers and employees are Christians.

163.    CEA's bylaws contain Statements of Faith, Christian Values, and Christian Ethical Convictions.

164.    Entities joining CEA must adhere to these statements.

165.    CEA members place Jesus Christ as the center and foundation of their organizations and are called to live out their faith in every aspect of their operations, including the workplace.

166.    Nonprofits joining CEA must have either their highest executive officer or a majority of their governing body be Christian, and they must either have Section 501(c)(3) status or be specially approved by CEA's president as being nonprofit.

167.    For-profit entities joining CEA must be at least 51% owned by Christians or by trusts or other entities wholly controlled by Christians, and 51% or more of those persons comprising the entity's governing body, if any, must be Christians.

168.    Under CEA's bylaws, members pay dues.

A.    **CEA Members' Beliefs Regarding Sex (and So-Called Gender Identity)**

169.    CEA members believe that God purposefully designs and creates humans as distinctly male or female, that His purposeful design and creation of

humans as male or female is immutable, that human creation reflects the image and likeness of God, and that males and females are complementary to each other.

170.    CEA members believe that male and female are immutable realities defined by biological sex and that gender transition is contrary to CEA's Christian Values.

171.    CEA members believe and teach that gender-transition efforts are wrong, and that they cannot, as a matter of religious conscience and conviction, knowingly or intentionally perform, participate in, pay for, facilitate, enable, or otherwise support gender transitions.

### B.    CEA Members' Beliefs Regarding Human Life (and Abortion)

172.    CEA members believe that human life, from the moment of conception to natural death, is sacred and that human life should be honored and protected at all stages of life.

173.    CEA members believe that abortion is the intentional taking of human life or termination of pregnancy at any time from the moment of conception through birth and that abortion is contrary to CEA's Christian Values.

174.    CEA members believe that the use of human embryonic stem cells acquired from the destruction of nascent human life and the use of fetal tissue acquired from abortion is contrary to CEA's Christian Values.

### C.    CEA Members' Required Conduct and Speech with Respect to Gender Transitions and Abortions.

175.    To be a member of CEA, an entity cannot provide services for, healthcare coverage of, reimbursement for, or access to the following activities, unless the member has exhausted all alternatives that do not create a greater transgression of these, and such member has taken all reasonable steps to avoid all such transgressions:

27

- Abortions and abortion-inducing drugs and devices;
- Gender reassignment therapies and surgery;
- Counseling which affirms or encourages any acts or behavior violating Christian Values; or
- Any medical treatments, procedures, or medication contrary to Christian Values.

176. CEA members believe that all people have the God-given right to exercise their faith freely, without interference from the government.

177. CEA members believe that Christians are called to exercise their faith in every area of their lives—their homes, schools, ministries, businesses, and communities.

178. The commitment of CEA members to comply with CEA's Statements of Faith, Christian Values, and Christian Ethical Convictions in their employment practices is part of CEA members' religious witness and religious exercise.

### D.    CEA Members' Injuries from EEOC's Mandates

179. CEA members' current employment practices categorically exclude affirming or facilitating gender-transition efforts or elective abortions.

180. If CEA members were forced to affirm or facilitate gender-transition efforts or elective abortion, they would violate their religious exercise.

181. Compliance with the EEOC Mandates would force CEA members to facilitate, speak in favor of, not speak against, and "accommodate" abortion and gender transitions, and would force them to compel their employees to do the same so the entities are in compliance with the EEOC Mandates.

182. The EEOC Mandates impose the following no-win choice on CEA members: (1) abandon or violate their religious exercise and incur the costs of compliance with the mandates; (2) maintain their positions and practices but risk liability, lawsuits, and investigations; or (3) exit the business or nonprofit world altogether and abandon their customers, investors, and employees.

### 1.    Moms for America

183.    Among CEA members in good standing identified in this case is Moms for America, a nonprofit corporation located in Branson, Missouri.

184.    Moms for America exists to empower moms, promote liberty, and raise patriots to heal America from the inside out. Moms for America builds a national movement of moms to promote the principles of Liberty to restore the Republic, and create a culture of truth, family, and freedom in our homes and communities.

185.    As a pro-life nonprofit advocacy organization, Moms for America promotes a positive message about family, motherhood, and the sanctity of human life from the moment of conception.

186.    In describing its story, Moms for America states that it is a "cultural movement of moms [that] marches forward together to restore the value of motherhood, marriage, womanhood, life, and patriotism proclaimed through the lives they lead, the children they raise, and the liberty they possess."[15]

187.    As Moms for America states on their website, "Life is a sweeping issue that encompasses us all. We must pray, speak, share posts, and care deeply for everyone as we hold to this truth: every life is precious, unique, and sacred—from conception until natural death."[16]

188.    Further, Moms for America takes the position that "[w]e at Moms for America proudly stand to protect the unborn and the right to life. Protecting the sanctity of life has been a pillar of mothers and fathers across the globe for decades.

---

[15] Moms for America, Our Story, https://momsforamerica.us/our-story/.

[16] *What Happens After Birth? Pro-Life Americans Step Up to Help*, Moms for America (May 12, 2024), https://momsforamerica.us/blog/what-happens-after-birth/.

We value the family at Moms for America—that means protecting babies from conception to birth and beyond."[17]

189.    As Moms for America stated in praise of the overturning of *Roe v. Wade*: "Now, the erroneous ruling is struck down. At long last, it is finally on the ash heap of history where it belongs. Still, we mourn abortion's slaughter of more than 63 million innocent children killed by this atrocity that attempts to hide its blood-soaked history behind a seemingly innocuous word: 'Choice.'"[18]

190.    Moms for America promotes the pro-life movement by sharing inspiring stories about the sanctity of all human life even in the face of very difficult circumstances where abortion is suggested, taking the position that "Life is precious. Period."[19]

191.    Moms for America engages publicly on the most pressing issues, including highlighting abortion as one of the most prominent topics to guide people in voting in the 2024 national election, insisting that President Trump's policies "will allow more babies to live compared to Harris, who promises to sign a federal law to bring abortion back permanently to every state in the union."[20]

192.    Moms for America has told moms that "[w]e must protect and educate our kids to understand physical, spiritual, and common-sense truths as they grow.

---

[17] Press Release, Moms for America Support Overturning *Roe v. Wade* (May 3, 2022), https://momsforamerica.us/press-releases/moms-for-america-support-overturning-roe-v-wade/.

[18] *Post* Roe's *Reversal, the Fight for Innocent Life Continues*, Moms for America (Mar. 29, 2024), https://momsforamerica.us/blog/post-roes-reversal-the-fight-for-innocent-life-continues/.

[19] *6 Real Lives to Inspire the Growing Pro-Life Movement*, Moms for America (Mar. 17, 2024), https://momsforamerica.us/blog/6-real-lives-to-inspire-the-growing-pro-life-movement/.

[20] *Moms: Consider Now Before Voting in the 2024 Presidential Election*, Moms for America (Oct. 14, 2024), https://momsforamerica.us/blog/consider-now-before-voting-in-2024/.

When they are old enough, teach them about the scourge of abortion and the truth about Planned Parenthood, so they'll know to steer clear."[21]

193.    Because of the importance of pro-life advocacy to Moms for America, it can only employ persons whose conduct does not contradict its pro-life position.

194.    As a result, Moms for America objects to complying with the PWFA Abortion Mandate's requirement that it not take any adverse action against an employee or applicant because of her decision to have an abortion inconsistent with Moms for America's position on abortion.

195.    Moms for America affirms CEA's Statements of Faith, Christian Values, and Christian Ethical Convictions, including with respect to sex and human life, and gender transitions and abortions, and it operates consistent with CEA's requirements.

## 2.    Predictive Fitness

196.    Another of CEA's Members identified for purposes of this case is Predictive Fitness, Inc., a business located in Southlake, Texas.

197.    Predictive Fitness is an innovator in AI-powered fitness software solutions for endurance athletes, coaches, and health-conscious individuals.

198.    Predictive Fitness is a company that has adopted Christian principles and is governed by Christians consistent with CEA's requirements for governance of entities that are members of CEA.

199.    Predictive Fitness affirms CEA's Statements of Faith, Christian Values, and Christian Ethical Convictions, including with respect to sex and human

---

[21] *Guardians of Women's Health? The Ugly Truth About Planned Parenthood*, Moms for America (May 27, 2023), https://momsforamerica.us/blog/guardians-of-womens-health-the-ugly-truth-about-planned-parenthood/.

life, and gender transitions and abortions, and it operates consistent with CEA's requirements.

### 3.    The Impact of EEOC's Mandates on Moms for America and Predictive Fitness

200.    Together, both entities (Moms for America and Predictive Fitness) are representative of CEA's members, and both are similarly situated to CEA members as a whole.

201.    Both entities have more than fifteen employees and are "employers" as defined in Title VII and the PWFA.

202.    Both entities have employment policies or practices under which they will not affirm or facilitate gender-transition efforts or elective abortions.

203.    Both entities have sincerely held religious beliefs under which they will not affirm or facilitate gender-transition efforts or elective abortions.

204.    Both entities object to having to change their current employment policies and practices, or to alter their speech.

205.    Both entities object to having to coerce their employees' speech to comply with the EEOC Mandates.

206.    Both entities want to ensure that they need not use an employee's self-selected pronouns or ensure that employee may access single-sex facilities (like restrooms and locker rooms) based on gender identity.

207.    Both entities have a duty to protect the privacy and dignity of all employees, and neither would allow employees to access single-sex spaces of the opposite sex.

208.    Both entities seek to speak freely and in truth, and both seek to respect employees' freedom to speak freely, so neither can use inaccurate or opposite-sex pronouns or otherwise treat a person as the opposite sex, or require employees to do so.

209.   Both entities oppose treating employees as the opposite sex, such as by making exceptions to sex-specific dress codes, so that a male would wear female attire if he identifies as female.

210.   Both entities would need to devote significant time and resources to creating or updating policies, customs, or training programs, and both oppose incurring those financial, logistical, and reputational costs.

211.   Both entities object to posting posters stating that they comply with the EEOC Mandates.

212.   Both entities want to ensure that they are free to promote pro-life options like adoption without government censorship, and that they need not provide additional on-demand leave above normal allowance for an employee to get an elective abortion.

213.   Both entities support pro-life alternatives to abortion, like adoption.

214.   Both entities object to giving special and extra leave to women above a normal allowance, including paid leave or special time-off privileges, simply to obtain an elective abortion.

215.   As noted above, as a pro-life non-profit advocacy organization, Moms for America additionally objects to complying with the PWFA Abortion Mandate's requirement that it not take any adverse action against an employee or applicant because of their decision to have an abortion inconsistent with Moms for America's position on abortion.

216.   Both Predictive Fitness and Moms for America thus face liability from Defendants for exercising their religion by categorically refusing to affirm or facilitate transition efforts or elective abortions.

## VI.    CEA's Need for Judicial Relief

217.    Federal courts have held that EEOC's mandates violate the free exercise of religion. *See, e.g.*, *Cath. Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1029 (D.N.D. 2024) (enjoining PWFA Rule's abortion-accommodation mandate, as well EEOC's 2024 Guidance as applied to the Catholic Benefits Association and its members); *Louisiana v. EEOC*, 705 F. Supp. 3d 643, 644 (W.D. La. 2024) (enjoining PWFA Rule's abortion-accommodation mandate as applied to United States Conference of Catholic Bishops and two Catholic dioceses).

218.    The relief provided by those decisions does not encompass CEA and its members.

219.    Absent relief from this Court, if CEA members refuse to affirm or facilitate gender-transition efforts or elective abortions in the workplace, they are currently threatened by EEOC with burdensome and costly investigations, civil lawsuits, fines, and other enforcement mechanisms.

220.    If CEA members are coerced to comply with the EEOC Mandates, they incur compliance costs that cannot be recovered from the federal government because of sovereign immunity.

221.    Injunctive and declaratory relief are necessary to redress this irreparable harm.

222.    Defendant EEOC is an agency, and Defendant Burrows is its official, under the Administrative Procedure Act (APA). 5 U.S.C. § 551(1).

223.    The EEOC Mandates are "rules" under the APA and are "final agency action" reviewable by this Court. *See id.* § 551(4); *id.* § 704.

224.    Each of the EEOC Mandates is a legislative or substantive rule.

225.    The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702.

226.    Each of the EEOC Mandates is "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

227.    No statute precludes judicial review of the EEOC Mandates, and they are not committed to agency discretion by law, under 5 U.S.C. § 701(a).

228.    The EEOC Mandates are definitive and determine the rights and obligations of persons, including CEA's members.

229.    EEOC calls for the EEOC Mandates to be treated as if they have the full force of law.

230.    CEA challenges Defendants' enforcement of the EEOC Mandates, whether from EEOC interpretations or guidance, or in the alternative from Title VII itself or the PWFA itself.

231.    CEA's members are regulated parties under the EEOC Mandates.

232.    CEA suffers legal wrong and adverse effects from the agency actions.

233.    CEA and its members have no adequate or available administrative remedy or remedy at law.

234.    All the acts of the Defendants described above, and their officers, agents, employees, and servants, were executed and are continuing to be executed by Defendants under the color and pretense of the policies, statutes, ordinances, regulations, customs, and usages of the United States.

## CLAIMS FOR RELIEF

### COUNT I
### EEOC Gender-Identity Mandate
### Administrative Procedure Act
### 5 U.S.C. § 701, et seq.

235.    CEA incorporates by reference paragraphs 1–234.

236.    The EEOC Gender-Identity Mandate (including the EEOC's website content and its 2024 Guidance) is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," "without observance of procedure required by law," "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

### A.    Statutory Violations

237.    The EEOC Gender-Identity Mandate is contrary to law and in excess of statutory authority.

238.    Title VII does not define "sex" as encompassing gender identity, and Congress intended "sex" to mean only the biological difference between male and female when it passed Title VII.

239.    Recognizing physiological differences between the sexes does not violate Title VII. In fact, sex-specific facilities can be necessary to prevent unlawful harassment.

240.    The EEOC Gender-Identity Mandate unlawfully seeks to elevate the category of gender identity (absent from Title VII) over sex (actually protected under Title VII).

241.    By its own terms, *Bostock* does not encompass gender identity discrimination under Title VII beyond hiring and firing; it does not address private spaces, pronoun usage, or workplace speech.

242.    Congress has not delegated to the Defendants the authority to prohibit gender-identity discrimination under Title VII.

243.    As explained in greater detail in Count V, EEOC's Gender-Identity Mandate violates the Religious Freedom Restoration Act, and therefore exceeds EEOC's statutory authority, because the mandate substantially burdens CEA's

members' religious exercise, and is not the least restrict means of advancing a compelling government interest.

### B.    Procedural Violations

244.    EEOC lacks authority under Title VII to issue binding substantive rules, regulations, or guidance.

245.    Consequently, EEOC's Gender-Identity Mandate exceeds the agency's statutory authority.

246.    EEOC's Gender-Identity Mandate is a substantive rule but did not undergo notice and comment consistent with the APA.

247.    Even if the EEOC's Gender-Identity Mandate or parts of it are not a substantive rule, EEOC was still required to publish their text in the Federal Register because they are a "statement[ ] of general policy or interpretation[ ] of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(l)(D).

248.    EEOC did not publish the text of its Gender-Identity Mandate in the Federal Register as required by the APA. *Id.*

249.    EEOC's Gender-Identity Mandate was published on its website unlawfully because EEOC skipped the required public comment period.

### C.    Arbitrary and Capricious

250.    Under the APA, a reviewing Court must "hold unlawful and set aside agency action" if the agency action is "arbitrary," "capricious," or "an abuse of discretion." 5 U.S.C. § 706(2)(A).

251.    In drafting and promulgating the EEOC Gender-Identity Mandate, EEOC failed to undergo reasoned decision-making or to adequately consider important issues.

252.    EEOC failed to adequately consider that sex is a biological reality.

253.     EEOC failed to adequately consider that there is an evolving state of medical knowledge about gender-transition efforts, and that the EEOC Gender-Identity Mandate short-circuits this debate.

254.     EEOC improperly relied on unreliable facts and studies only from proponents of gender-transition efforts and improperly ignored or disregarded the numerous experts who explain that scientific evidence does not support the Gender-Identity Mandate but instead suggests that the risks of such procedures outweigh any potential benefits.

255.     EEOC failed to adequately consider the disproportionately negative impact of the EEOC Gender-Identity Mandate on women and girls.

256.     EEOC failed to adequately quantify and consider the compliance costs of its mandates.

257.     EEOC failed to adequately consider the harm that comes to employees when employers ignore or misconstrue the biological differences between the sexes.

258.     EEOC overlooked female employees whose rights of privacy and safety are threatened by allowing males into female single-sex spaces such as restrooms, locker rooms, and lactation rooms simply because those males identify as female.

259.     Nor did EEOC consider the burden on employers and employees who cannot speak falsely and use self-selected pronouns based on gender identity, or cannot otherwise treat employees as the opposite sex, such as with dress codes.

260.     EEOC failed to consider alternative policies, such as exempting religious organizations or respecting employers' scientific judgment about gender transitions.

### D.    Constitutional Violations

261.    As explained further in Count III below, EEOC's Gender-Identity Mandate violates separation of powers, and is therefore contrary to constitutional right, power, privilege, or immunity.

262.    As explained further in Count V below, EEOC's Gender-Identity Mandate violates the Free Exercise Clause, and is therefore contrary to constitutional right, power, privilege, or immunity.

263.    As explained in greater detail in Count VI below, the Gender-Identity Mandate violates the Free Speech Clause of the First Amendment, and therefore its promulgation and enforcement are contrary to constitutional right, power, privilege, or immunity.

264.    For all these reasons, the Court should hold unlawful and set aside EEOC's Gender-Identity Mandate.

**COUNT II**
**PWFA Abortion Mandate**
**Administrative Procedure Act**
**5 U.S.C. § 701, et seq.**

265.    CEA incorporates by reference paragraphs 1–234.

266.    The PWFA Abortion Mandate, that is, its 2024 PWFA Rule, is unlawful and must be "set aside" because it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(D).

### A.    Statutory Violations

267.    The PWFA does not authorize EEOC to require accommodations for abortion.

268.    Abortion is not within the scope of the PWFA's requirement to accommodate a "known limitation," meaning a "physical or mental condition related

39

to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4).

269.    The PWFA does not protect an employee's demand for an accommodation to have an abortion.

270.    The PWFA does not authorize EEOC to police the speech of employers or employees about abortion.

271.    The PWFA does not authorize EEOC to limit the hiring or employment practices of pro-life non-profit organizations regarding abortions undertaken contrary to those organizations' views and policies.

272.    The PWFA Abortion Mandate violates the PWFA's statement that it shall not be construed "to invalidate or limit the powers, remedies, and procedures under any Federal law or law of any State or political subdivision of any State or jurisdiction that provides greater or equal protection for individuals affected by pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg-5(a)(1).

273.    Congress has not delegated to the Defendants the authority to interpret or enforce the PWFA as EEOC does in the PWFA Rule about abortions.

274.    The PWFA Abortion Mandate violates the major questions doctrine, because if Congress had intended to require abortion accommodations, it needed to do so clearly, and did not in the PWFA, which never mentions abortion.

275.    To the extent EEOC applies Title VII itself, independent of the PWFA, to require abortion accommodations and restrict pro-life speech, Title VII and its amendments prohibit that application and render EEOC's actions contrary to law.

276.    As explained in greater detail in Count V below, the PWFA Abortion Mandate violates the Religious Freedom Restoration Act, and therefore exceeds EEOC's statutory authority, because the mandate substantially burdens CEA's members' religious exercise, and is not the least restrict means of advancing a compelling government interest.

## B.    Arbitrary and Capricious

277.    EEOC's imposition of an abortion mandate under the PWFA which does not authorize it was arbitrary, capricious, and an abuse of discretion.

278.    EEOC failed to sufficiently consider the fact that abortion is not a "known limitation" under the PWFA, meaning a "physical or mental condition related to, affected by, or arising out of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000gg(4).

279.    EEOC failed to discuss or sufficiently consider reliance interests on the part of entities that would violate their religious beliefs by complying with the PWFA Abortion Mandate.

280.    EEOC failed to sufficiently address religious liberty interests in the PWFA Abortion Mandate by failing to affirm or create a religious exemption.

281.    EEOC acted arbitrarily and capriciously by curtailing and refusing to extend Title VII's religious exemption language, which PWFA incorporated, into the PWFA Rule's application of abortion-accommodation requirements.

282.    EEOC failed to provide a sufficient rationale for disagreeing with the comments of entities such as CEA whose members would have their religious exercise substantially burdened by the PWFA Abortion Mandate.

## C.    Constitutional Violations

283.    The PWFA Abortion Mandate violates the Quorum Clause of the U.S. Constitution, U.S. Const. art. I, § 5, cl. 1, because the House of Representatives lacked a quorum when it passed the PWFA through proxy voting.

284.    The Quorum Clause states that:

Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, and *a Majority of each shall constitute a Quorum to do Business*; but a smaller Number may adjourn from day to day, and may be authorized *to compel the*

> *Attendance of absent Members*, in such Manner, and under such Penalties as each House may provide.

*Id.* (emphasis added).

285.    The Quorum Clause's text, the structure of the Constitution, and the longstanding practice of Congress to conduct its business in-person collectively establish that the Constitution forbids proxy voting.

286.    The Court should enter an injunction prohibiting the Defendants from applying the PWFA Abortion Mandate against CEA and its members because the PWFA violates the Quorum Clause.

287.    As explained further in Count III below, the PWFA Abortion Mandate violates separation of powers, and is therefore contrary to constitutional right, power, privilege, or immunity.

288.    As explained further in Count V, the PWFA Abortion Mandate violates the Free Exercise Clause, and therefore its promulgation and enforcement are contrary to constitutional right, power, privilege, or immunity.

289.    As explained in greater detail in Count VII, the PWFA Abortion Mandate violates the Free Speech Clause of the First Amendment, and therefore its promulgation and enforcement are contrary to constitutional power.

290.    For all these reasons, the Court should hold unlawful and set aside the PWFA Abortion Mandate.

## COUNT III
### EEOC's Gender-Identity Mandate and PWFA Abortion Mandate Violation of the Separation of Powers

291.    CEA incorporates by reference paragraphs 1–234.

292.    The EEOC Mandates violate the separation of powers because of the agency's unconstitutional independent status.

293.    EEOC's organizational structure violates Article II of the Constitution, which vests all the executive power in the President.

294.    The Constitution requires that the President have the authority to remove those who assist him in carrying out his duties, especially in an agency that engages in both rulemaking and enforcement.

295.    The constitutional requirement of at-will removal applies to EEOC's commissioners.

296.    But EEOC interprets its own governing statute, which provides five-year terms for Commissioners, 42 U.S.C. § 2000e-4(a), as allowing removal only for cause.

297.    Under this approach, even if the President disagrees with the Commissioners, he could not remove them at-will but must cite malfeasance, inefficiency, or neglect of duty in any attempt to remove them.

298.    EEOC holds quintessentially executive powers including regulatory, enforcement, and litigating authority.

299.    EEOC's independent-agency structure thus violates the Constitution.

300.    Alternatively, as a matter of constitutional avoidance, this Court should declare that EEOC's organic statute, which provides only for a term-of-years appointment, allows for at-will removal before those terms expire.

301.    EEOC's unlawful structure renders its rules unlawful and requires setting aside the EEOC Mandates as void.[22]

## COUNT IV
### EEOC's Gender-Identity Mandate and PWFA Abortion Mandate Violation of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1,

302.    CEA incorporates by reference paragraphs 1–234.

---

[22] CEA preserves the argument that the Supreme Court should reverse or reconsider precedent governing *Consumers' Research v. Consumer Product Safety Commission*, 91 F.4th 342 (5th Cir. 2024), *cert denied* (Oct. 21, 2024), a decision about another agency.

303. As discussed above, CEA members' sincerely held religious beliefs prohibit them from affirming or facilitating gender-transition efforts or elective abortions.

304. CEA members exercise (and wish to continue to exercise) these sincerely held religious beliefs by declining to affirm or facilitate gender-transition efforts or elective abortions.

305. CEA members' compliance with these beliefs constitutes the exercise of religion. *See* 42 U.S.C. § 2000bb-2(4); *see also* 42 U.S.C. § 2000cc-5(7).

306. CEA members' exercise of religion includes their objection to complying with the EEOC Mandates.

307. RFRA prohibits the government from substantially burdening a person's exercise of religion unless the government can show that application of the burden to that person is in furtherance of a compelling governmental interest and is the least restrictive means of achieving it.

308. The EEOC Mandates compel CEA members to violate their religious beliefs by affirming or facilitating gender-transition efforts or by affirming or facilitating elective abortions.

309. The EEOC Mandates impose significant pressure on CEA's members to stop operating consistent with their religious beliefs.

310. EEOC's enforcement of the EEOC Mandates substantially burdens CEA members' exercise of religion.

311. EEOC does not have a compelling interest in enforcing the EEOC Mandates as applied to CEA members.

312. The EEOC Mandates are not the least restrictive means of furthering any purported compelling governmental interest.

313.    Myriad alternative forms of regulation would accomplish the Defendants' purported governmental interest without infringing on CEA members' religious exercise.

314.    EEOC's interpretation of sex discrimination under Title VII and the resulting EEOC Gender-Identity Mandate and the EEOC's impending threat of enforcing it against CEA members violate RFRA.

315.    EEOC's interpretation of the PWFA and the resulting PWFA Abortion Mandate and EEOC's impending threat of enforcing it against CEA members violate RFRA.

316.    If Title VII is deemed to prohibit discrimination on the basis of gender identity as set forth in the agency action, or to prohibit discrimination on the basis of abortion or restrict pro-life activities or communications, EEOC's enforcement of this aspect of Title VII should be enjoined for the same reasons.

317.    If the PWFA is deemed to require affirming or facilitating elective abortion as set forth in the agency action, EEOC's enforcement of this aspect of the PWFA should be enjoined for the same reasons.

## COUNT V
### EEOC's Gender-Identity Mandate and PWFA Abortion Mandate Violation of the Free Exercise Clause of the First Amendment

318.    CEA incorporates by reference paragraphs 1–234.

319.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof …." U.S. Const. amend. I.

320.    CEA asserts the rights of its members under the Free Exercise Clause of the First Amendment.

321.    The Free Exercise Clause protects CEA members in their exercise of religion from the actions of Defendants in issuing and enforcing the Mandate.

322.    CEA members' sincerely held religious beliefs prohibit them from affirming or facilitating gender-transition efforts or elective abortions.

323.    CEA members exercise (and wish to continue to exercise) these sincerely held religious beliefs by declining to affirm or facilitate gender-transition efforts or elective abortions.

324.    CEA members' compliance with these beliefs constitutes the exercise of religion.

325.    CEA members' exercise of religion includes their objection to complying with the EEOC Mandates.

326.    The EEOC Mandates compel CEA members to violate their religious beliefs by affirming or facilitating gender-transition efforts or by affirming or facilitating elective abortions.

327.    The EEOC's enforcement of its mandates substantially burdens CEA members' exercise of religion.

328.    The EEOC Mandates exert significant pressure on CEA's members to violate their beliefs in order to keep operating as businesses or non-profit organizations without facing lawsuits and liability.

329.    The EEOC Mandates are not neutral or generally applicable.

330.    Upon information and belief, the EEOC Mandates specifically and primarily burden religious conduct, favor some religious beliefs over others, and are motivated by animus and hostility towards the religious beliefs of entities such as CEA's members.

331.    The EEOC Mandates are not supported by a compelling governmental interest and are not the least restrictive means of advancing such an interest.

332.    The lack of a gender-identity nondiscrimination workplace mandate in Title VII, and of an abortion nondiscrimination mandate in the PWFA, result in the

EEOC Mandates being unsupported by any governmental interest of any weight that could justify them under any test applicable under the Free Exercise Clause.

333.    The EEOC Mandates, and Defendants' enforcement thereof, violate the rights of CEA's members under the Free Exercise Clause of the First Amendment.

334.    If Title VII is deemed to prohibit discrimination on the basis of gender identity as set forth in the agency action, or to prohibit discrimination on the basis of abortion or restrict pro-life activities or communications, EEOC's enforcement of this aspect of Title VII should be enjoined under the Free Exercise Clause.

335.    If the PWFA is deemed to require affirming or facilitating elective abortion as set forth in the agency action, EEOC's enforcement of this aspect of the PWFA should be enjoined under the Free Exercise Clause of the First Amendment.

## COUNT VI
### EEOC's Gender-Identity Mandate
### Violation of the Free Speech Clause of the First Amendment

336.    CEA incorporates by reference paragraphs 1–234.

337.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech …." U.S. Const. amend. I.

338.    The EEOC Gender-Identity Mandate restricts CEA members' speech, chills their speech, and compels their speech.

339.    The EEOC Gender-Identity Mandate requires use of self-selected pronouns and otherwise restricts workplace speech about issues relating to gender identity to the extent EEOC considers such speech to be harassment or create a hostile work environment.

340.    The EEOC Gender-Identity Mandate censors speech and imposes a viewpoint-based speech regulation on CEA members' speech by prohibiting them from declining to affirm or facilitate gender transition efforts.

341.    The EEOC Gender-Identity Mandate compels CEA members' speech by requiring CEA members and their employees to use employee-selected pronouns, to keep records that identify individuals according to their self-identified gender and not simply their biological sex, to change their employment policies governing speech, and to modify signage as necessary for access to single-sex facilities.

342.    The EEOC Gender-Identity Mandate chills CEA members' speech by discouraging them from having full and frank conversations with their employees and others on issues relating to gender identity.

343.    CEA members hold views on the debated topic of gender identity that differ from the government's views, but CEA members are prohibited from conveying their views on this topic because doing so violates the EEOC Gender-Identity Mandate.

344.    CEA members' speech on gender-transition efforts falls under the First Amendment's protection.

345.    The EEOC Gender-Identity Mandate threatens financial burdens on CEA members based on the content of the views they wish to express.

346.    The EEOC Gender-Identity Mandate does not further a compelling or substantial governmental interest.

347.    The EEOC Gender-Identity Mandate is not narrowly tailored to achieve any purported governmental interest.

348.    The EEOC Gender-Identity Mandate cannot satisfy applicable First Amendment scrutiny.

349.    The Court should enjoin enforcement of the EEOC Gender-Identity Mandate and declare it to violate the Free Speech Clause of the First Amendment.

## COUNT VII
## EEOC's PWFA Abortion Mandate
## Violation of the Free Speech Clause of the First Amendment

350.    CEA incorporates by reference paragraphs 1–234.

351.    Under the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech …." U.S. Const. amend. I.

352.    The PWFA Abortion Mandate restricts CEA members' speech, chills their speech, and compels their speech.

353.    The PWFA Abortion Mandate restricts employer and co-employee speech that favors life over abortion to the extent EEOC considers such speech to be harassment, create a hostile work environment, or undermine accommodations for abortion.

354.    The PWFA Abortion Mandate censors speech and imposes a viewpoint-based speech regulation on CEA members' speech by prohibiting them from declining to affirm or facilitate abortions.

355.    The PWFA Abortion Mandate chills CEA members' speech by discouraging them from having full and frank conversations with their employees and others on issues related to abortion.

356.    CEA members hold views on the debated topic of abortion that differ from the government's views, but CEA members are prohibited from conveying their views on this topic because doing so violates the PWFA Abortion Mandate.

357.    CEA members' speech on abortions falls under the First Amendment's protection.

358.    The PWFA Abortion Mandate threatens financial burdens on CEA members based on the content of the views they wish to express.

359.    The PWFA Abortion Mandate does not further a compelling or substantial governmental interest.

360.   The PWFA Abortion Mandate is not narrowly tailored to achieve any purported governmental interest.

361.   The PWFA Abortion Mandate cannot satisfy applicable First Amendment scrutiny.

362.   The Court should enjoin enforcement of the PWFA Abortion Mandate and declare it to violate the Free Speech Clause of the First Amendment.

## PRAYER FOR RELIEF

Plaintiff asks that the Court enter judgment against Defendants, and provide Plaintiff, including its present and future members, with the following relief:

A.   Hold unlawful, set aside, vacate, and enjoin enforcement of EEOC's Gender-Identity Mandate and PWFA Rule, to the extent that they address gender identity or abortion, under 5 U.S.C. §§ 701, 706;

B.   Enjoin the EEOC's Gender-Identity Mandate and PWFA Rule, to the extent that they address gender identity or abortion, under 5 U.S.C. §§ 701, 705;

C.   Issue a permanent injunction, prohibiting Defendants EEOC and Chair Charlotte Burrows, and their officers, agents, and successors, from:

1.   implementing, enforcing, or applying the EEOC Gender-Identity Mandate or the PWFA Rule, as to gender identity or abortion, against CEA and its present and future members;

2.   interpreting or enforcing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the PWFA, or any implementing

regulations against the CEA members to require them to affirm or facilitate gender-transition efforts or elective abortion; and

3. requiring CEA members to recognize employees' gender identity instead of their sex, to provide employees access to single-sex facilities based on gender identity, to use employees' self-selected pronouns based on gender identity, to determine compliance with dress codes based on gender identity, to refrain from considering elective abortion in employment decisions, to refrain from pro-life or pro-adoption speech, and to provide special privileges for abortion such as extra leave (including paid leave) above normal allowance, or to censor, compel, or chill speech on transition efforts or elective abortion;

D. Declare that EEOC's independent-agency structure violates the Constitution or that EEOC's organic statute, which provides only for a term-of-years appointment, allows for at-will removal of EEOC Commissioners, and therefore that the EEOC's enforcement of its Mandates is unconstitutional as the EEOC is currently structured;

E. Declare that the EEOC Gender-Identity Mandate and PWFA rule violate the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, and Free Exercise Clause as to CEA's members;

F. Declare that the EEOC Gender-Identity Mandate and PWFA Rule violate the Administrative Procedure Act and the Free Speech Clause as to CEA's members;

G. Declare that the PWFA Abortion Mandate violates the Administrative Procedure Act and the Quorum Clause of the Constitution;

H.   Expressly extend all such relief to protect and benefit any of CEA's present or future members;

I.   Adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that such declarations will have the force and effect of final judgment;

J.   Grant the requested injunctive relief without a condition of bond or other security being required of CEA;

K.   Award CEA the costs of this action and reasonable attorney's fees as provided by law, including 28 U.S.C. § 2412(d) and 42 U.S.C. § 1988(b);

L.   Grant any other relief this Court deems equitable, just, and proper; and

M.   Retain jurisdiction of this matter as necessary for enforcing this Court's orders.

Respectfully submitted this 15th day of January, 2025.

*/s/ Matthew S. Bowman*

| | |
|---|---|
| **Julie Marie Blake** | **Matthew S. Bowman** |
| VA Bar No. 97891 | DC Bar No. 993261 |
| **Alliance Defending Freedom** | **Alliance Defending Freedom** |
| 44180 Riverside Parkway | 440 First Street NW, Suite 600 |
| Lansdowne, Virginia 20176 | Washington, DC 20001 |
| Telephone: (571) 707-4655 | Telephone: (202) 393-8690 |
| Facsimile: (571) 707-4790 | Facsimile: (202) 347-3622 |
| jblake@ADFlegal.org | mbowman@ADFlegal.org |

*Counsel for Plaintiff Christian Employers Alliance*