**UNITED STATES DISTRICT COURT**
**DISTRICT OF NORTH DAKOTA**
**WESTERN DIVISION**

| | |
|---|---|
| CHRISTIAN EMPLOYERS ALLIANCE, on behalf of itself and its members.<br><br>*Plaintiff*,<br><br>v.<br><br>UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al.<br><br>*Defendants*. | Case No. 1:25-cv-00007-DLH-CRH |

## SETTLEMENT AGREEMENT

By and through their respective counsel, Plaintiff Christian Employers Alliance ("CEA"), on behalf of itself and its members, along with Defendants the United States Equal Employment Opportunity Commission ("EEOC") and Andrea R. Lucas, in her official capacity as Chair of the EEOC (collectively, the "Parties"), hereby agree to settle and compromise Counts I and VI, and on Counts III-V concerning "gender identity," as asserted in the Complaint in the civil action captioned *CEA v. EEOC*, No: 1:25-cv-00007-DLH-CRH (D.N.D.) (the "Civil Action"), under the terms and conditions set forth in this Settlement Agreement (the "Agreement") and the Court's accompanying dismissal order.

1. For purposes of this agreement, "covered conduct" means any allegation that CEA or a CEA member (as defined in Paragraph 2) (a) failed to engage in or refrain from, or failed to require employees to engage in or refrain from, speech relating to gender transition, gender identity, or transgender status, or failed to affirm or facilitate such statuses, including, but not limited to, failing to use pronouns that are inconsistent with a person's biological sex; (b) failed to make

exceptions to sex-specific dress codes because of gender identity or transgender status; (c) failed to allow persons to use private spaces reserved for the opposite sex; or (d) failed to modify policies and training to reflect compliance with such requirements.

2. For purposes of this agreement, a "CEA member" means an entity who is a member of CEA at the time of the covered conduct and ascribes to CEA's Statement of Faith and Christian Ethical Convictions attached as Exhibit A to this agreement as condition of membership in the organization. The beliefs and convictions set forth include, as relevant to this Agreement, the belief and/or conviction that:

a. We believe a person's work and business, when informed and motivated by Christian Values, constitutes religious exercise and worship;

b. Christians are called to exercise their faith in every area of their lives – their homes, schools, ministries, businesses, and communities;

c. Male and female are immutable realities defined by biological sex. Gender reassignment is contrary to Christian Values; and

d. Unless a Member has exhausted all alternatives that do not create a greater transgression of Christian Values, and such Member has taken all reasonable steps to avoid all such transgressions, a Member cannot – consistent with Christian Values – provide services for, healthcare coverage of, reimbursement for, or access to . . . Gender reassignment therapies and surgery; Counseling affirming or encouraging any acts or behavior violating Christian Values; or Any medical treatments, procedures, or medication contrary to Christian Values.

3. This Agreement only covers entities who were members of CEA at the time of the alleged unlawful act(s). For a CEA member to be protected by this Agreement, the member must show the EEOC that:

a. they are approved by the CEA for meeting membership criteria, including subscription to the Statement of Faith and Christian Ethical Convictions in Exhibit A to this Agreement;

b. CEA's membership criteria has not substantively changed from Exhibit A attached and incorporated hereto;

c. the member is not yet specifically protected from EEOC's gender identity interpretations of Title VII by another court order; and

d. the member is not subject to an adverse ruling on the merits in another Title VII case on the above-listed topics in the covered conduct.

e. The member shall show it satisfies requirements 3.a-.d outlined in this Paragraph by written attestation from itself or from CEA's president or her designee.

4. This Agreement covers a future member of CEA if the entity can make the showings in Paragraph 3 and the certifications set forth in Paragraph 7.b of this Agreement, on the condition that at the time that member joined CEA, a continuing requirement of CEA membership is subscription to the recitals of beliefs and convictions set forth in in Paragraph 2 and Exhibit A to this agreement and the future member of CEA was a member at the time of the alleged unlawful act(s).

5. The EEOC agrees not to pursue any charge against CEA or a CEA member who can make the certifications set forth in Paragraph 7.b of this Agreement, to the extent the charge asserts an unlawful employment action(s) based upon the covered conduct.

6. Nothing in this Agreement shall prevent the EEOC from fulfilling its statutory obligations when a charge concerns an allegation against a CEA member concerning the covered conduct, including:

a. taking any action in connection with the acceptance of a charge for filing regardless of the alleged conduct, including receiving an online inquiry via the agency's Public

Portal; requesting or receiving a questionnaire or other correspondence from the charging party or his/her representative; or conducting an intake interview of the charging party;

b. serving a notice of the charge upon a CEA member within ten days as required by 42 U.S.C. § 2000e-5(b);

c. notifying charging parties alleging conduct covered by this order against employers also covered by this order that a right-to-sue notice will be issued with respect to covered conduct; and

d. issuing a right-to-sue notice to a charging party who has filed a charge against a CEA member concerning the above-listed topics in accordance with the requirements and procedures set forth in 42 U.S.C. § 2000e-5(b) & (f)(1) and 29 C.F.R. § 1601.28(a)(1) & (2).

7. Upon receiving notice of a charge alleging discrimination on the basis of the covered conduct forth in Paragraph 1 or a charge that the CEA member has reason to believe might relate to a topic in Paragraph 1, or a notice of expansion of the charge to include allegations of discrimination on any topic set forth in Paragraph 1, it is the responsibility of the CEA member to:

a. Notify the EEOC that it is a covered party under this Agreement in accordance with Paragraph 2-4;

b. Provide written certification, sworn under penalty of perjury, to the EEOC that:

i. The entity has sincerely held beliefs that are consistent with the beliefs and convictions set forth in Exhibit A to the Agreement;

ii. The governing structure of the entity permits it to conduct all business operations as guided by and consistent with the beliefs and convictions set forth in Exhibit A to the Agreement;

iii. The entity does in fact conduct all business operations as guided by and consistent with the beliefs and convictions set forth in Exhibit A to the Agreement; and

iv. If, assuming, arguendo, the employment actions alleged in the charge are true, those actions would have been taken pursuant to the entity's sincerely held beliefs as set forth Exhibit A to this Agreement.

c. The certification in Paragraph 7.b.iv does not require admitting the allegations in the charge or allegations that arise during investigation of a charge alleging uncovered conduct. The certification shall not be construed as an admission by the CEA member to any allegation.

8. The EEOC does not violate this Agreement by taking any action against a respondent who has not identified itself as a member of CEA who is covered by this Agreement to a directly responsible EEOC agency official. If the EEOC, unaware of an entity's status as a member of CEA, takes any action, the CEA or CEA member can promptly notify a directly responsible EEOC official of the fact of the entity's membership in CEA and its protection under this Agreement. Once such official receives notice from the CEA member and verification from CEA in accordance with this Agreement, the EEOC will comply with this Agreement with respect to the member provided that member makes all certifications set forth in this Agreement. The EEOC is not in breach of this Agreement for any action it takes prior to receiving notice from a covered party that a charge implicates this Agreement and the covered party provides the Paragraph 3 written attestations and sworn certifications in Paragraph 7.b. Upon receipt of notice from a covered party, the EEOC will not take further action on any covered conduct alleged in a charge covered by this Agreement for a period of 30 days to allow a covered party to comply with Paragraphs 3 and 7.b. If a party does not comply with Paragraphs 3 and 7.b within 30 days of notifying the EEOC that it is a covered party,

then the EEOC may resume the investigation under standard investigatory procedures. Nothing in this paragraph precludes a covered party from receiving the benefits of this Agreement should it satisfy all conditions of this Agreement after the 30-day period has run but EEOC shall not be liable for any actions it took in the interim.

9. This Agreement does not prevent the EEOC from investigating allegations of unlawful conduct not specifically covered by this Agreement, even if they are alleged within the same charge that alleges covered conduct against CEA or its members. For charges that include allegations related to both covered and non-covered conduct, while EEOC further investigates the non-covered conduct it shall take no further action as to the covered conduct. Consistent with Paragraph 6.c-.d, in such cases nothing precludes the EEOC from issuing one notice of right sue for both covered and noncovered conduct at an appropriate time in the EEOC's discretion.

10. As set forth in Paragraph 7, if the EEOC is investigating a charge that on its face does not implicate the covered conduct and then as part of that investigation the EEOC issues a notice of expansion of the charge that implicates the covered conduct, it is the responsibility of CEA or its members to notify the EEOC that the expanded investigation implicates this Agreement and make the certifications in Paragraph 7.b.

11. Where it is unclear from the charge's face that the allegations implicate covered conduct but a CEA member has reason to believe the charge might implicate the covered conduct, it is the CEA members' responsibility to notify the EEOC as required by Paragraph 7.a. that it is a covered party under this Agreement, the entity believes the charge involves allegations covered by this Agreement, and then make the certifications required by Paragraph 7.b. In such circumstances, nothing in this Agreement prevents the EEOC from investigating allegations of unlawful conduct in the charge not specifically covered by this Agreement but if the charge does in fact implicate covered conduct the EEOC will take no further action as to the covered conduct other than issue a right-to-

sue-notice regarding covered conduct consistent with Paragraph 6.c-.d.

12. Upon execution of this Agreement, counsel for the Parties will file a joint motion asking the Court to issue an order dismissing with prejudice the Counts asserted in the Civil Action marked as Counts I and VI, and Counts III-V to the extent they concern gender identity issues, attaching and incorporating the Agreement, and retaining jurisdiction to enforce the Agreement.

13. This Agreement does not apply to Counts II and VII, and Counts III, IV, and V, of the Civil Action concerning the Pregnant Workers Fairness Act, nor does it dismiss Plaintiff's claims for costs and attorneys' fees in connection with the Civil Action on any counts.

14. This Agreement does not constitute an admission by Defendants of the allegations in the complaint.

15. This Agreement, which may be executed in counterparts, shall be effective once the Court has granted the parties' joint motion. PDF versions of signatures will constitute acceptable, binding signatures for purposes of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Dated: August 12, 2026

Counsel for Defendants:

**ERIC J. HAMILTON**
Deputy Assistant Attorney General
Civil Division

**DIANE KELLEHER**
Branch Director

JACOB SILER Digitally signed by JACOB SILER
Date: 2026.08.12 17:33:03
-04'00'

**JACOB S. SILER** (DC Bar No. 1003383)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: 202-353-4556
Fax: 202-616-8460
Email: jacob.s.siler@usdoj.gov

On behalf of Defendants EEOC and Andrea R. Lucas, in her official capacity as Chair of the EEOC

Counsel for Plaintiff:

*/s/ Matthew S. Bowman*
**Matthew S. Bowman**
DC Bar No. 993261
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
mbowman@ADFlegal.org

On behalf of Plaintiff Christian Employers Alliance

# Exhibit A

# FOURTH AMENDED AND RESTATED BYLAWS
# OF
# CHRISTIAN EMPLOYERS ALLIANCE

August 5, 2022

## ARTICLE I
## STATEMENT OF FAITH AND CHRISTIAN ETHICAL CONVICTIONS

**Section 1.1.** **Statement of Faith.** The Christian Employers Alliance, a North Dakota corporation ("Alliance"), its officers, Directors, Employees, and its Members shall subscribe to this Statement of Faith:

**1.1.1.** We believe the Bible is inspired, infallible, and the authoritative Word of God. It is the source of all we believe concerning truth and morality.

**1.1.2.** We believe that there is one God, eternally existent in three persons: Father, Son, and Holy Spirit.

**1.1.3.** We believe in the deity of our Lord Jesus Christ, His virgin birth, His sinless life, His miracles, His vicarious and atoning death through His shed blood, His bodily resurrection, His ascension to the right hand of the Father, and His personal return in power and glory.

**1.1.4.** We believe that for the salvation of lost and sinful people, regeneration by the Holy Spirit is essential.

**1.1.5.** We believe in the present ministry of the Holy Spirit by whose indwelling the Christian is enabled to live a godly life.

**1.1.6.** We believe in the resurrection of both the saved and the lost--they that are saved unto the resurrection of life and they that are lost unto the resurrection of damnation.

**1.1.7.** We believe in the spiritual unity of believers in our Lord Jesus Christ.

**1.1.8.** We believe every person is created in the image of God and has inherent dignity, regardless of situation, brokenness, or sin.

**1.1.9.** We believe a person's work and business, when informed and motivated by Christian Values, constitutes religious exercise and worship.

**Section 1.2.** **"Christian Values," "Christian".** The Statement of Faith and Christian Ethical Convictions or the Nicene Creed for the purpose of membership only; and the Christian Ethical Convictions, together with such other determinations of faith and values as determined by the Board of Directors, after consultation with the Ethics Committee, are collectively referred

to as "Christian Values." One who lives his or her life according to Christian Values is "Christian."

**Section 1.3. <u>Christian Ethical Convictions</u>.** The Alliance, its officers, Directors, and Members shall subscribe to these Christian Ethical Convictions:

**1.3.1.** Human life, from the moment of conception to natural death, is sacred. Human life should be honored and protected at all stages of life.

**1.3.2.** Abortion is the intentional taking of human life or termination of pregnancy at any time from the moment of conception through birth. Abortion is contrary to Christian Values.

**1.3.3.** The use of human embryonic stem cells acquired from destruction of nascent human life and the use of fetal tissue acquired from abortion is contrary to Christian Values.

**1.3.4.** Suicide and assisted suicide are contrary to Christian Values.

**1.3.5.** Male and female are immutable realities defined by biological sex. Gender reassignment is contrary to Christian Values.

**1.3.6.** Marriage is a lifelong, permanent, and monogamous heterosexual union.

**1.3.7.** Unless a Member has exhausted all alternatives that do not create a greater transgression of Christian Values, and such Member has taken all reasonable steps to avoid all such transgressions, a Member cannot—consistent with Christian Values—provide services for, healthcare coverage of, reimbursement for, or access to:

A. Abortions and abortion inducing drugs and devices.

B. Treatments derived from human embryonic stem cells acquired from destruction of a fertilized ovum, or from fetal tissue acquired from an abortion.

C. Assisted suicide.

D. Gender reassignment therapies and surgery.

E. Counseling affirming or encouraging any acts or behavior violating Christian Values, or

F. Any medical treatments, procedures, or medication contrary to Christian Values.

**1.3.8.** All people have the God-given right to exercise their faith freely, without interference from the government.

**1.3.9.** Christians are called to exercise their faith in every area of their lives — their homes, schools, ministries, businesses, and communities.

**Section 1.4.** **Application of Christian Values**. Christian Values are fundamental to the operations of the Alliance. Its actions must be consistent with Christian Values.

## ARTICLE II
## OFFICES

**Section 2.1.** **Principal Office**. The principal office shall be at the address stated in the Alliance's most recent filing with the North Dakota Secretary of State. The initial principal office of the Alliance is 6101 Associated Boulevard, Everett, Washington, 98203.

**Section 2.2.** **Registered Office**. The registered office shall be at the address stated in the Alliance's most recent filing with the North Dakota Secretary of State.

## ARTICLE III
## MEMBERS

**Section 3.1.** **Membership Qualifications**. When an employer satisfies the following qualifications established by the Board, and is accepted by the President in accordance with Section 3.2.2, below, the employer shall become a Member of the Alliance ("Member"):

**3.1.1.** Members shall be employers that commit to provide health care benefits consistent with Christian Ethical Convictions and to support the right and freedom of Christian employers to do so.

**3.1.2.** Non-profit Members shall: (i) subscribe to the Alliance's Statement of Faith or Nicene Creed; (ii) affirm that either its highest executive officer or a majority of its governing body is Christian, and (iii) either have Section 501(c)(3) status or be specially approved by the President as being non-profit.

**3.1.3.** For-profit Members shall affirm that (i) Christians (or trusts or other entities wholly controlled by Christians) own 51% or more of the Member, and (ii) 51% or more of those persons comprising the Member's governing body, if any, are Christians.

**3.1.4.** Members shall pay dues to the Alliance on a timely basis.

**Section 3.2.** **Admission**.

**3.2.1.** Potential Members must complete and sign the application for membership.